# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JOHN SOLAK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2023-0469-SG |
| | ) | |
| MOUNTAIN CREST CAPITAL LLC, | ) | |
| SUYING LIU, DONG LIU, NELSON | ) | |
| HAIGHT, TODD MILBOURN, and | ) | |
| WENHUA ZHANG, | ) | |
| | | |
| Defendants. | | |

## MEMORANDUM OPINION

Date Submitted: June 12, 2024
Date Decided: October 18, 2024

Blake A. Bennett, COOCH AND TAYLOR, P.A., Wilmington, Delaware; OF COUNSEL: Jeffrey M. Norton, Benjamin D. Baker, NEWMAN FERRARA LLP, New York, New York, *Attorneys for Plaintiff*.

Andrew H. Sauder, Daniel S. Atlas, DAILEY LLP, Wilmington, Delaware; OF COUNSEL: Ryan J. Levan, DAILEY LLP, Philadelphia, Pennsylvania, *Attorneys for Defendants*.

**GLASSCOCK, Vice Chancellor**

This matter involves the peculiar incentive structure of that recently popular vehicle to create public corporations, the special purpose acquisition company, or "SPAC." The bulk of internal-affairs corporate litigation references potential agency problems inherent in our corporate model, which separates ownership and control. The incentive structures of the SPAC, which tend to pit the interests of the creating actors (who have "founder" shares that have value only if the stockholders approve a merger within a specified time) against the common stockholders (who have a redemption right and the power to stymie any merger and exercise redemption) intensify the agency problems inherent in the form, considerably.

The adult anaconda, they say, eats perhaps once a year;[1] open its belly, and you will see not what it is eating, but what is *has eaten* in times past. So too with the progress of litigation through the belly of Chancery; the sorting out of the fiduciary problems inherent in the SPAC form, together with other factors, has reduced the SPAC population on the ground,[2] but the bulge of SPAC carcasses continues to be digested in equity.[3] This straightforward SPAC matter involves

---

[1] BBC Wildlife Magazine, *Can a Green Anaconda Swallow a Human?* Discover Wildlife (Apr. 12, 2024 at 6:36 AM), https://www.discoverwildlife.com/animal-facts/reptiles/green-anaconda-facts.

[2] While there were a total of 613 SPAC IPOs in 2021, that number dwindled to a mere 31 IPOs in 2023. *IPO Transactions By Year*, SPACInsider, www.spacinsider.com/data/stats (last visited Oct. 18, 2024).

[3] This phenomenon has also been noted by Vice Chancellor Will. *See In re Hennessy Cap. Acq. Corp. IV S'holder Litig.*, 318 A.3d 306, 306 (Del. Ch. 2024) ("Though the SPAC market has contracted, SPAC lawsuits are ubiquitous in Delaware.").

founder executives and a conflicted board charged with breaching duties of loyalty by materially misinforming stockholders who faced a double-headed decision: whether to redeem their investment of $10 per share (with interest) or elect to approve a merger in return for equity in the new entity.[4] If so, the stockholders have a direct claim for breach of duty. The matter is before me on a motion to dismiss under Rule 12(b)(6).

The allegations here are not strong, compared with other SPAC cases that have survived motions to dismiss. The Controller Defendants do not have voting control, and the Director Defendants' interest in the transaction, while tangible, is marginal. The failure of disclosure is limited to not disclosing the value of the entity in terms of cash per share. Instead, the Proxy stated that the value per share was around the $10 redemption value. Nonetheless, a majority of stockholders redeemed, although the Merger also received majority support. The allegations here, I find, are close to the line between an adequate and an inadequate claim. Nonetheless, applying as I must reasonable inferences in favor of Plaintiff, I find the causes of action pled to lie on side of viability. Accordingly, the Motion to Dismiss is denied. My reasoning follows.

---

[4] These decisions are not mutually exclusive but are linked in a way addressed below.

# I. BACKGROUND[5]

*A. The Parties*

Plaintiff John Solak ("Solak") is a stockholder of Mountain Crest Acquisition Corp. II ("MCAD" or the "Company").[6] MCAD—now renamed Better Therapeutics, Inc. ("New Better Therapeutics")—is a special purpose acquisition company ("SPAC").[7] Plaintiff has held shares in MCAD since July 13, 2021.[8]

Defendant Mountain Crest Capital LLC (the "Sponsor") is a Delaware limited liability company that serves as MCAD's sponsor.[9]

Defendant Suying Liu ("Liu") served as MCAD's Chief Executive Officer ("CEO") and Chairman of its Board of Directors.[10] Liu was also the managing member of the Sponsor.[11] He was also the managing member of the sponsor of at least four related SPACs: Mountain Crest Acquisition Corp. ("MCAC"), Mountain Crest Acquisition Crest Acquisition Corp. III ("MCAC3"), Mountain Crest

[5] This Memorandum Opinion only contains facts necessary to my analysis. Unless otherwise noted, the facts are drawn from Plaintiff's Complaint. Verified Class Action Compl. ¶ 22., Dkt. 1 ("Compl.").
[6] *Id.* ¶ 22.
[7] *Id.* ¶¶ 1, 31.
[8] *Id.* ¶ 22.
[9] *Id.* ¶ 23.
[10] *Id.* ¶¶ 24, 39.
[11] *Id.* ¶ 24.

Acquisition Corp. IV ("MCAC4") and Mountain Crest Acquisition Corp. V ("MCAC5").[12]

Defendant Dong Liu ("D. Liu") was MCAD's Chief Financial Officer and a member of its Board. D. Liu is the other member of the Sponsor.[13]

Defendants Nelson Haight ("Haight"), Todd Milbourn ("Milbourn"), and Wenhua Zhang ("Zhang") were members of MCAD's Board since October 2020.[14] Haight, Milbourn, and Zhang, also served as members of the board of directors for MCAC, MCAC3, MCAC4, and MCAC5.[15]

*B. Factual Background*

### 1. MCAD's Formation

Defendants Liu and D. Liu (together with the Sponsor, "Controller Defendants") were the sole members of the Sponsor.[16] Liu and D. Liu caused the Sponsor to incorporate MCAD in Delaware on July 31, 2020.[17] Before MCAD went public, Liu and D. Liu caused MCAD to issue to the Sponsor 1,437,500 founder shares, amounting to 20% of MCAD's post-IPO equity for a nominal cost of

---

[12] *Id.* ¶ 24 n.1; Pl.'s Answering Br. in Opp'n to Defs.' Mot. to Dismiss Verified Class Action Compl. at 13 n.38, Dkt. No. 33 ("Pl.'s Opp'n").
[13] Compl. ¶ 25.
[14] *Id.* ¶¶ 26–28.
[15] *Id.*; Pl.'s Opp'n 13.
[16] Compl. ¶¶ 39, 100.
[17] *Id.* ¶ 39.

$25,000.[18] Founder shares differ from public shares in that holders of founder shares waive their right to redeem their shares or participate in a liquidation.[19]

## 2. MCAD's Board

Liu, through the Sponsor, selected MCAD's four other Board members: D. Liu, Haight, Milbourn and Zhang (together with Liu, the "Board" or "Director Defendants").[20] Notably, Haight, Milbourn, and Zhang (the "Non-Controller Directors") serve as directors on Liu's four other sponsored SPACs: MCAC, MCAC3, MCAC4, and MCAC5.[21] All MCAD directors held direct or indirect economic interests in the private placement units and founder shares owned by the Sponsor, including 2,000 shares beneficially owned by Haight, Milbourn, and Zhang, respectively.[22]

## 3. MCAD's IPO

MCAD completed its initial public offering ("IPO") on January 8, 2021, raising an aggregate of $57.5 million.[23] MCAD sold five million units to public investors for $10 per unit, raising proceeds totaling $50 million.[24] The underwriters exercised their over-allotment of 750,000 units issued for an aggregate amount of

---

[18] *Id.*
[19] *Id.* ¶ 9.
[20] *Id.* ¶ 10.
[21] *Id.* ¶ 44; Pl.'s Opp'n 13 n.38.
[22] Compl. ¶ 45.
[23] *Id.* ¶¶ 40–41.
[24] *Id.* ¶ 40.

5

$7,500,000.[25]  Each unit consisted of one share of common stock, and one right to receive, at no cost, 1/10 of a share of common stock upon consummation of a merger.[26]  The shares of common stock were redeemable for $10—the IPO price of the units—plus interest.[27]  The funds raised in MCAD's IPO were retained in a trust account and could only be used to redeem shares, to contribute to a merger, or to return the public stockholders' investment if MCAD were to liquidate rather than merge.[28]  As a SPAC, MCAD's sole business purpose was to find a merger partner; if successful, thereafter it would conduct the business acquired.

Concurrent with the IPO, MCAD sold 185,000 private placement units to the Sponsor and Chardan Capital Markets, LLC, generating gross proceeds of $1,850,000.[29]  The Sponsor purchased 142,500 private units for $1,425,000.[30]  The proceeds from the private placement units would be used for the initial underwriting fee for MCAD's IPO and for the minimal operating expenses between the time of the IPO and MCAD's eventual merger with a target company.[31]

---

[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] *Id.* ¶ 41.
[29] *Id.* ¶ 42.
[30] *Id.* ¶ 8.
[31] *Id.* ¶ 42.

## 4. MCAD's Merger

Per its charter, MCAD originally had only nine months following its IPO to merge with another company.[32] The Company later amended its certificate of incorporation to extend its deadline to 15 months after IPO.[33] As is typical with SPACs, if MCAD failed to merge with another company within this deadline, public stockholders would receive, pro rata, all proceeds of the IPO plus accrued interest (approximately $10 per share).[34]

On the other hand, because holders of founder shares waived their right to redeem their shares or to participate in a liquidation, MCAD's failure to merge would render the founder shares and private placement units worthless. This would mean that the Liu, the Sponsor, and the Directors who held economic interests in the founder shares and private placement units would get nothing, and the Sponsor would lose its initial investment.[35]

On April 7, 2021, MCAD and Better Therapeutics announced that they had entered into a merger agreement (the "Merger").[36] Under the agreement, MCAD and Better Therapeutics stockholders would receive shares in the combined company, New Better Therapeutics.[37] Liu and D. Liu dominated the negotiations

---

[32] *Id.* ¶ 48.
[33] *Id.*
[34] *Id.* ¶¶ 5, 9.
[35] *Id.*
[36] *Id.* ¶ 49.
[37] *Id.*

with Better Therapeutics, and with investors in a PIPE transaction that would provide additional financing to New Better Therapeutics.[38]

On October 12, 2021, MCAD filed with the SEC and mailed to its stockholders a proxy statement (the "Proxy") recommending that stockholders vote to approve the Merger.[39] The Proxy informed the stockholders that (1) they could vote whether to approve or disapprove the Merger at a special meeting on October 27, 2021; and (2) the deadline to redeem their shares was October 25, 2021—two days before the special meeting.[40]

In recommending the Merger, the Proxy attributed a value of $10 to each MCAD share.[41] But after accounting for, *inter alia*, the dilutive effect of redemptions, founder shares, and the transaction costs associated with the Merger, MCAD had less than $7.50 in net cash per share to invest in the Merger.[42] The Proxy did not state MCAD's net cash per share.[43]

---

[38] *Id.* ¶¶ 13, 53.
[39] *Id.* ¶ 50; *See* Ex. 1 to Transmittal Aff. of Andrew H. Sauder In Supp. Of Defs.' Opening Br. Supp. Their Mot. To Dismiss Verified Class Action Compl., Dkt. 31 ("Proxy").
[40] Compl. ¶ 50; Proxy 1, 9.
[41] Compl. ¶ 58; Pl.'s Opp'n 43. For instance, in describing the transaction, MCAD described the consideration as including "15,000,000 shares of MCAD's Common Stock, based on a price of $10.00 per share." Proxy 89. Likewise, the Proxy stated that "the merger consideration is based on a deemed price per share of $10.00 a share." *Id.* at 8.
[42] Compl. ¶ 57.
[43] *Id.* ¶¶ 65–69.

For the Merger to be consummated, $5,000,001 of stockholder's funds had to be available in MCAD's trust to devote to the acquisition.[44] Put another way, holders of at least 8.7% of the stock must have forgone redemption, or else the Merger would fail. On October 27, 2021, the stockholders approved the Merger.[45] Public stockholders redeemed 4,826,260 shares (approximately 84% of shares eligible for redemption) for a total cash value of $48,273,000.[46] Only 923,740 shares (16.07% of total eligible shares)—including Plaintiff's—remained after the Merger.[47]

### 5. Post-Merger Performance

Prior to the Merger, MCAD's shares had been trading around $10 per share. By the redemption deadline, the stock price had fallen to $9.57 per share.[48] On October 27, 2021, the date the Merger closed, the stock price was trading at $10.97 per share.[49] By January 27, 2021, three months after the Merger, the Company's stock price declined to $3.68. By the time Plaintiff filed his complaint, New Better Therapeutics' stock price was $1.28 per share.[50]

---

[44] Pl.'s Opp'n 32; Proxy 19–20.
[45] Compl. ¶ 51.
[46] *Id.* The Complaint notes that 79.1% of outstanding shares were redeemed, as opposed to the 5,750,000 shares issued in MCAD's IPO. *Id.*; Defs.' Opening Br. Supporting Their Mot. To Dismiss Verified Class Action Compl. at 17, Dkt. No. 30 ("Defs.' OB").
[47] Defs.' OB 17.
[48] Compl. ¶ 73.
[49] *Id.* ¶ 74.
[50] *Id.* ¶ 78.

*C. Procedural History*

On April 28, 2023, Plaintiff filed his Verified Class Action Complaint (the "Complaint"), on behalf of himself and similarly situated current and former stockholders of MCAD.[51]  In Count I, Plaintiff brings a direct claim for breach of fiduciary duty against the Director Defendants.[52]  In Count II, Plaintiff brings a direct claim for breach of fiduciary duty against the Controller Defendants.[53]  In Count III, Plaintiff brings a direct claim for unjust enrichment against the Sponsor and the Director Defendants.[54]

On July 11, 2023, Plaintiff moved for default judgment against all Defendants.[55]  On September 20, 2023, the Court entered an order of default.[56]  The parties later stipulated to a proposed order vacating the default, which the Court entered on October 3, 2023.[57]  On January 17, 2024, Defendants filed their Opening Brief Supporting their Motion to Dismiss Verified Class Action Complaint.[58]  Once

---

[51] Compl.
[52] *Id.* ¶¶ 91–98.
[53] *Id.* ¶¶ 99–107.
[54] *Id.* ¶¶ 108–11.
[55] Pl.'s Mot. for Default J., Dkt. No. 9.
[56] Granted Ord. for Pl.'s Mot. for Default J. Before Vice Chancellor Sam Glasscock Dated 9.20.23, Dkt. No. 21.
[57] Granted (Stipulation and Proposed Ord. Vacating Default J. on behalf of the parties), Dkt. No. 24.
[58] Defs.' OB.

briefing completed, I heard oral argument on June 12, 2024.[59]  I considered the

matter fully submitted as of that date.

## II. ANALYSIS

Defendants have moved to dismiss the Complaint under Court of Chancery

Rule 23.1 for failure to plead demand futility and under Rule 12(b)(6) for failure to

state a claim.[60]  As a threshold matter, Defendants aver that Plaintiff's claims are

derivative, requiring Plaintiff to make a demand on the Board, or impermissible

holder claims.[61]  I reject these arguments, as discussed below.  Defendants also seek

dismissal under Rule 12(b)(6) for failure to state a claim.[62]

When considering a motion to dismiss pursuant to Rule 12(b)(6), the Court

focuses on whether the plaintiff has stated reasonably conceivable direct claims

against the defendants under the requisite standard:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (i[v]) dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[63]

---

[59] Tr. of 6-12-2024 Oral Arg. on Defs.' Mot. to Dismiss Held via Zoom, Dkt. No. 47 ("Tr").
[60] *See* Defs.' OB.
[61] Defs.' OB 35, 42–44.
[62] Defs.' OB. Defendants also argue that Plaintiff's disclosure claim must be dismissed to the extent that he seeks more than nominal damages. Def.' OB 39–41. I do not need to address this argument at this stage and decline to do so now.
[63] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (citations omitted).

11

While I must accept reasonable inferences logically drawn from the face of the Complaint, I may not accept factually unsupported inferences and conclusory statements.[64] After applying the entire fairness standard of review to Plaintiff's breach of fiduciary duty claims, I determine that Plaintiff has stated reasonably conceivable direct claims against Defendants.

### A. Plaintiff Brings Direct Non-Holder Claims

Plaintiff alleges two counts of breach of fiduciary duty against all Director Defendants and against Controller Defendants, as well as an unjust enrichment claim against all Defendants.[65] Defendants argue that Plaintiff's claims are derivative and must be dismissed under Rule 23.1.[66] To determine whether a claim is direct or derivative, the Court applies the *Tooley* test, which asks two questions: "(1) who suffered the alleged harm"; and "(2) who would receive the benefit of any recovery or other remedy?"[67] This Court has repeatedly applied the *Tooley* test to cases where plaintiffs allege that a SPAC's board of directors improperly interfered with

---

[64] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (citing *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001)).

[65] Compl.

[66] Defs.' OB 42–44.

[67] *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004); *see also In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 801 (Del. Ch. 2022) (quoting *Tooley*, 845 A.2d at 1039) ("To show a direct injury under *Tooley*, a plaintiff 'must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation.'").

stockholders' redemption rights, and each time has determined that the claim is direct.[68] This case is no different.

Here, the crux of Plaintiff's breach of fiduciary claims is that the Proxy "affirmatively misled MCAD's stockholders by attributing a value of $10 to their shares," which interfered with their right to decide whether to redeem their shares.[69] Plaintiff's unjust enrichment claim is based on Defendants being enriched by their alleged disloyal conduct.[70] The stockholders suffered the alleged harm from this interference of their redemption right.[71] As for *Tooley*'s second prong, the stockholders would receive the benefit of any recovery because the "damages awarded would be based on the stockholders' redemption right from the funds held in trust."[72] Thus, Plaintiff's claims are direct, and Plaintiff need not plead demand futility under Rule 23.1.

---

[68] *See, e.g.*, *Multiplan*, 268 A.3d at 802–03; *Delman v. GigAcquisitions3*, 288 A.3d 692, 709–10 (Del. Ch. 2023); *Laidlaw v.*, 2023 WL 2292488, at *6 (Del. Ch. Mar. 1, 2023); *In re XL Fleet (Pivotal) S'holder Litig.*, C.A. No. 2021-0808-KSJM, at 19:5–21:12 (Del. Ch. June 9, 2023) (TRANSCRIPT); *Malork v. Anderson*, C.A. No. 2022-0260-PAF, at 18:3–20:14 (Del. Ch. July 17, 2023) (TRANSCRIPT).

[69] Compl. ¶ 65; Pl.'s Opp'n 23. In the Complaint, Plaintiff also claimed that the Proxy "failed to quantify the economic interests of the Board in seeing a transaction occur," and that the Board "breached its duty of candor in presenting the stockholders the choice between approving the Merger and redeeming or liquidating." Compl. ¶¶ 64, 71. Defendants argue that these two claims should be dismissed. Defs.' OB 22–24, 32. Plaintiff failed to address these claims in his briefing, and I consider them waived. *See Emerald P'rs v. Berlin*, 726 A.3d 1215, 1224 (Del. 1999).

[70] Compl. ¶¶ 108–11.

[71] *See Delman*, 288 A.3d at 709 ("Because of a SPAC's distinctive structure and the absence of a meaningful vote on the merger, the redemption right is the central form of stockholder protection . . . . Interference with that right produces an injury that would not run to the corporation.").

[72] *XL Fleet*, C.A. No. 2021-0808-KSJM, at 21:7–9.

13

Defendants also argue that the Court should dismiss the Complaint because it asserts an impermissible holder claim. A holder claim is "a cause of action by persons wrongfully induced to *hold* stock instead of selling it."[73] But here, the dispute focuses on Plaintiff's investment decision to not redeem his shares and to instead invest in the post-merger entity.[74] This is "an active and affirmative choice around which the SPAC structure revolved."[75] Plaintiff does not bring a holder claim.

*B. The Breach of Fiduciary Duty Claims*

The question before me is whether Plaintiff has stated a reasonably conceivable claim for breach of fiduciary duty against the Director Defendants and the Controller Defendants.[76] "Directors of Delaware corporations owe duties of care and loyalty to the entity and its stockholders."[77] "[T]he duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared

---

[73] *Citigroup Inc. v. AHW Inv. P'ship*, 140 A.3d at 1132 (quoting *Small v. Fritz Cos., Inc.*, 65 P.3d 1255, 1256 (Cal. 2003)) (emphasis in original).

[74] Pl.'s Opp'n 24.

[75] *Multiplan*, 268 A.3d at 808.

[76] Compl. ¶¶ 91–107. Plaintiff brings a claim for breach of fiduciary duty against the Director Defendants in Count I and Controller Defendants in Count II. *Id.* For the purposes of this motion to dismiss, I consider these claims under a singular theory.

[77] *Delman*, 288 A.3d at 712 (citing *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006)).

by the stockholders generally."[78]  "The duty of disclosure is an 'application of the fiduciary duties of care and loyalty' implicated when fiduciaries communicate with stockholders."[79]  "[W]here there is reason to believe that the board lacked good faith in approving a disclosure, the violation implicates the duty of loyalty."[80]  Here, under an entire fairness standard of review, Plaintiff has alleged a reasonably conceivable claim for breach of the fiduciary duty of loyalty.

### 1. The Standard of Review is Entire Fairness

When determining whether corporate fiduciaries have breached their duties, the Court "evaluates their conduct through the lens of a standard of review" which informs the evidentiary and pleading burdens.[81]  Delaware's default standard of review, the business judgment rule, presumes "that in making a business decision, the board of directors 'acted on an informed basis, in good faith and in the honest belief that the action was taken in the best interests of the company.'"[82]  But the presumption of the business judgment rule will be rebutted where the plaintiff alleges "'facts supporting a reasonable inference that a transaction involved a controlling stockholder' engaged in a conflicted transaction, to the detriment of other

---

[78] *Multiplan*, 268 A.3d 784, 799–800 (Del. Ch. 2022) (quoting *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993)).
[79] *Id.* at 800 (quoting *Dohmen v. Goodman*, 234 A.3d 1161, 1168 (Del. 2020)).
[80] *Id.* (quoting *Pfeffer v. Redstone*, 965 A.2d 676, 690 (Del. 2009)).
[81] *XL Fleet*, C.A. No. 2021-0808-KSJM, at 22:17–20.
[82] *Multiplan*, 268 A.3d at 809 (quoting *Solomon v. Armstrong*, 747 A.2d 1098, 1111 (Del. Ch. 1999)).

15

stockholders"[83]  In other cases concerning de-SPAC transactions and direct claims around the purported impairment of stockholders' redemption rights, this Court has determined that "[t]he entire fairness standard of review applies due to inherent conflicts between the SPAC's fiduciaries and public stockholders in the context of a value-decreasing transaction."[84]  So too here.

Specifically, entire fairness applies here if the Controller Defendants engaged in a conflicted controller transaction.  "Delaware courts place conflicted controller transactions implicating entire fairness into one of two categories: 'where the controller stands on both sides' and 'where the controller competes with the common stockholders for consideration.'"[85]  This transaction, I find based on the facts alleged in the Complaint, falls into the second category.  In the following analysis, I determine that Plaintiff has pled sufficient particularized facts from which I must draw the reasonable inference that this case involved a conflicted controller transaction.

---

[83] *Laidlaw*, 2023 WL 2292488, at *7 (quoting *Larkin v. Shah*, 2016 WL 4485447, at *8 (Del. Ch. Aug. 25, 2016)).

[84] *Multiplan*, 268 A.3d at 792.

[85] *Id.* at 809 (quoting *In re Crimson Expl.*, 2014 WL 5449419, at *12 (Del. Ch. Oct. 24, 2014)).

### a. Controller Defendants Controlled MCAD

Plaintiff alleges a "chain of control" among Liu, D. Liu, and the Sponsor.[86] Specifically, Liu and D. Liu owned and controlled the Sponsor, which in turn controlled MCAD in connection with the Merger.[87] But the Controller Defendants only held 20% of MCAD's shares, making them minority stockholders.[88]

A minority stockholder will be deemed a "controlling stockholder" where it "*exercises control* over the business affairs of the corporation."[89] "In cases where 'soft' control has been found, the controller generally possesses a potent 'combination of stock voting power and managerial authority that enables him to control the corporation, if he so wishes.'"[90]

As recognized in other cases, "the governance structure of the SPAC makes it reasonably conceivable that the Sponsor was its controlling stockholder."[91] SPACs like MCAD particularly lend themselves to a finding of a control relationship because "[t]he sponsor of a SPAC controls all aspects of the entity from its creation

---

[86] Compl. ¶ 7. This structure closely resembles that seen in *Delman*. 399 A.3d at 716 ("The plaintiff alleges that a 'chain of control' allowed Katz to dominate Gig3, its Board, and the merger with Lightning. Katz owned and controlled the Sponsor which, in turn, controlled Gig3.").

[87] Compl. ¶¶ 7, 39.

[88] *Id.* ¶ 39.

[89] *Delman*, 288 A.3d at 716 (emphasis in original).

[90] *Id.* (quoting *In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 553 (Del. Ch. 2003)).

[91] *Id.*

until the de-SPAC transaction."[92] So too here. Plaintiff alleges that Liu and D. Liu caused Sponsor to incorporate MCAD in Delaware.[93] Liu, through the Sponsor, selected the Board.[94] Liu served as CEO and chairman of the Board.[95] And Liu, with D. Liu, "dominated the Merger negotiations with Better Therapeutics."[96]

Additionally, Plaintiff avers that Haight, Milbourn and Zhang were beholden to the Controller Defendants, based on both personal and financial ties.[97] According to the Proxy, Haight, Milbourn, and Zhang each received 2,000 founder shares, with an implied value of $20,000, in exchange for their service.[98] Liu also selected Haight, Milbourn, and Zhang to serve as directors on Liu's four other sponsored SPACs.[99] Plaintiff did not plead the size of Haight, Milbourn, and Zhang's interests in the other SPACs, but according to Defendants, they also received 2,000 founder shares for their membership on those boards of directors, as well.[100]

On the other hand, Defendants maintain that Haight, Milbourn, and Zhang's membership on other Liu-affiliated SPAC Boards is insufficient to show Controller

---

[92] *See id.* (noting that "the Sponsor created the Company and incorporated it in Delaware. It selected the initial Board, which would remain in place until the merger . . . closed. The Sponsor controlled the Board through [its CEO/founder] who, as discussed below, had close ties to and influence over each of the directors.").

[93] Compl. ¶ 39.

[94] *Id.* ¶ 10.

[95] *Id.* ¶ 7.

[96] *Id.* ¶¶ 5, 13, 53.

[97] *Id.* ¶¶ 43–45.

[98] Proxy 236.

[99] Compl. ¶¶ 44–45; Pl.'s Opp'n 14–15.

[100] Defs.' Reply Br. in Supp. Their Mot. to Dismiss Verified Class Action Compl. at 25, Dkt. No. 34 ("Defs.' RB"); Defs.' OB 7 n.6.

18

Defendants' control over the Board.[101]  Likewise, Defendants argue that Haight, Milbourn, and Zhang's 2,000 share interest is too minor to establish that they were beholden to Controller Defendants.[102]  Defendants correctly point out that Plaintiff makes no individual allegations regarding the three directors, relying on group pleading.[103]  At oral argument, Defendants suggested that the directors instead served on Liu's five Boards merely "out of professional interest."[104]

While this ultimately may prove to be the case, I cannot and do not draw that defendant-friendly inference.  Rather, based on the facts that are alleged, I draw the reasonable and plaintiff-friendly inference that Haight, Milbourn, and Zhang "expect[ed] to be considered for directorships" in future Liu-affiliated SPACs.[105]  Likewise, I draw the reasonable inference that they would "receive[] compensation for these various roles, which would be accretive to their compensation" from MCAD.[106]  Importantly, the directors' compensation here is not $20,000 cash, nor is it 2,000 shares of public stock.  It is 2,000 *founder shares*.  In other words, the Controller Defendants have created an incentive on the part of Haight, Milbourn, and Zhang to support any deal, else their equity become worthless.  This creates in

---

[101] Defs.' RB 27–28; Defs.' OB 53–54.
[102] Defs.' OB 47–48.
[103] *Id.* 45–46.
[104] Tr. 19:18–20:9.
[105] *Delman*, 288 A.3d at 720 (citing *Caspian Select Credit Master Fund Ltd. v. Gohl*, 2015 WL 5718592, at *7 (Del. Ch. Sept. 28, 2015)).
[106] *See id.*

19

the supposedly independent directors the same conflict with the public stockholders as taints the Controller Defendants. The interest of the Director Defendants in this transaction, and in any other matter, presumably, in which they served as SPAC directors, would have value only to the extent they could achieve a successful de-SPAC merger. Plaintiff has sufficiently pled facts from which it is reasonably conceivable that Controller Defendants had the managerial authority over MCAD and its Board to render them controllers.

### a. The Merger was a Conflicted Controller Transaction to the Detriment of Other Stockholders

"Entire fairness is not triggered solely because a company has a controlling stockholder. The controller also must engage in a conflicted transaction."[107] "A transaction involving a controlling stockholder may be viewed as conflicted, such that entire fairness review is warranted, where the controller 'extract[s] something uniquely valuable to [itself]' at the expense of other stockholders."[108]

Here, Plaintiff contends that "the conflict between the Sponsor and the stockholders and the 'unique benefit' achieved by the controller lies in the fact that the outcome for each differs dramatically if there were no merger."[109] The source of the conflict stems from the nature of MCAD's founder shares: given the timing

---

[107] *See id.* at 717 (quoting *Crimson Expl.*, 2014 WL 5449419, at *12).
[108] *Laidlaw*, 2023 WL 2292488, at *8 (quoting *Crimson Expl.*, 2014 WL 5449419, at *13).
[109] Pl.'s Opp'n 31.

of the proposed merger, I may infer that if MCAD did not merge with Better Therapeutics, it would be forced to liquidate, and Controller Defendants' investment would be worthless. Thus, Controller Defendants had a financial interest in effectuating any merger, regardless of its value. On the other hand, because public stockholders could receive their investment plus interest from the trust in a liquidation, they would prefer no deal to one worth less than $10. Put simply, Plaintiff would only want a deal worth $10 per share or more,[110] whereas the Controller Defendants want any deal, even one worth less than $10 per share.

As a technical matter, the public stockholders' decision whether to redeem their shares is independent from their decision whether to approve the Merger.[111] But these two decisions, made in tandem,[112] are intertwined and often conflated: a stockholder is in essence deciding whether to approve the merger *or* to redeem their shares. As such, the same competing interests that surround the merger decision likewise surround the redemption decision.

Further, as explained in *Multiplan*, the public stockholders' forgoing the redemption offer itself provided a unique benefit to the Controller Defendants

---

[110] Public stockholders had an incentive—in the form of the 10% incentive share dividend they would receive upon a merger—to prefer to roll over their equity rather than redeem, at around $10. Compl. ¶ 1.

[111] Stockholders who elected to redeem their shares nevertheless retained the right to vote on the Merger. Defs.' OB 17; Proxy 9 ("You may exercise your redemption rights whether you vote your shares of MCAD Common Stock 'FOR' or 'AGAINST' the Business Combination.").

[112] The deadline for stockholders to elect to redeem their shares was two business days before the special meeting to approve the Merger. Compl. ¶ 50.

because it "brought [them] one step closer to consummating a transaction that allegedly benefitted [them] to the detriment of [public] stockholders."[113] This is especially true here, where the Merger was contingent on 8.7% of public stockholders choosing to not redeem their shares.[114] The Controller Defendants were incentivized to discourage redemptions to "ensure greater deal certainty."[115] The Sponsor thus "effectively competed with the public stockholders for the funds held in trust."[116] Because of these conflicts between the Controller Defendants and the public stockholders, this transaction triggers entire fairness review.

### 2. Applying the Entire Fairness Standard

The next question is whether it is reasonably conceivable that the defendants breached their fiduciary duties under the entire fairness standard. Under the entire fairness standard, the defendant fiduciaries bear the burden "to demonstrate that the challenged act or transaction was entirely fair to the corporation and its [stockholders]."[117] The "fact intensive nature" of the entire fairness standard "normally will preclude dismissal of a complaint on a Rule 12(b)(6) motion to

---

[113] *See Multiplan*, 268 A.3d at 811.
[114] Pl.'s Opp'n 32.
[115] *See Delman*, 288 A.3d at 728–29 ("By providing inadequate disclosures about the amount of net cash available to [the SPAC] in the merger and [the target company's] prospects, the defendants could discourage redemptions and ensure greater deal certainty.").
[116] *See Multiplan*, 268 A.3d at 811.
[117] *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 52 (Del. 2006).

dismiss."[118]  But "[e]ntire fairness is not . . . a free pass to trial."[119]  "Even in a self-interested transaction," a plaintiff "must allege some facts that tend to show that the transaction was not fair."[120]  As the Court made clear in *Hennessy*:

> To state a viable *MultiPlan* claim, a plaintiff is required to plead facts making it reasonably conceivable that conflicted fiduciaries deprived public stockholders of a fair chance to exercise their redemption rights. If the impairment takes the form of disclosures, the facts must provide grounds to infer that the defendants made a material misstatement or omission—one affecting the total mix of information available to public stockholders deciding whether to redeem. The deficient disclosures are viewed in the context of the disloyal behavior that caused them and through the lens of the relevant equitable standard of review. Still, specific factual allegations supporting a conclusion that the redemption right was impaired remain essential.[121]

Here, the Proxy valued MCAD's shares at $10 per share.[122]  Plaintiff alleges that this is affirmatively misleading, noting that the Proxy failed to disclose the net cash per share that MCAD would contribute to the Merger.[123]  The Complaint avers

---

[118] *Delman*, 288 A.3d at 722 (quoting *Orman v. Cullman*, 794 A.2d 5, 21 n.36 (Del. Ch. 2002)).

[119] *Hennessy Cap. Acq. Corp. IV*, 318 A.3d at 319.

[120] *Delman*, 288 A.3d at 722 (quoting *Solomon v. Pathe Commc'ns Corp.*, 1995 WL 250374, at *5 (Del. Ch. Apr. 21, 1995)).

[121] *Hennessy Cap. Acq. Corp. IV*, 318 A.3d at 320.

[122] *See* Proxy 8, 27, 29, 76, 86, 89 (stating that "merger consideration is based on a deemed price per share of $10.00 a share"); Compl. ¶¶ 58, 65.  This affirmative misrepresentation, combined with the omission of net cash per share, mirrors the proxies at issue in *Delman* and *Laidlaw*.  In *Delman*, the proxy "indicated that the merger consideration" consisted of SPAC stock valued at $10 per share, but did not disclose that the net cash per share being placed into the merger was "less than $6 per share."  *Delman*, 288 A.3d at 723–24.  In *Laidlaw*, the proxy repeatedly "represented that [the SPAC's] shares were worth $10 each" but did not disclose that the net cash per share was $5.19. *Laidlaw*, 2023 WL 2292488, at *11.  In other words, the thrust of these disclosure claims is that the proxies not only omitted a net cash per share figure, *but also* affirmatively misrepresented the SPAC's stock as being valued at $10 per share.

[123] Pl.'s Opp'n 15, 43–44.

23

that net cash per share was only around $7.50 per share.[124]  Plaintiff argues that the omission of net cash per share in light of the proxy representation of a $10 per share value is highly material to a stockholder's redemption decision, because "pre-merger net cash per share is closely related to post-merger share value."[125]

As our caselaw has noted, failure to disclose net cash per share is not, in itself, a *per se* breach of duty.[126]  Here, however, the Proxy misstates an investment value of $10 per share and fails to disclose that the actual amount of cash being placed into the merger was 25% less than disclosed.[127]  In light of the assertion of a $10 valuation in the Proxy, it is reasonably conceivable that a stockholder would find the cash per share figure material to the decision whether to redeem or invest in the de-SPACed company.  At this pleading stage, I find these allegations—that the fiduciaries disclosed an investment value untethered to an undisclosed cash per share figure—sufficient to state a claim of breach, since it is "reasonably inferable" under the facts alleged "that a rational . . . investor would simply look to the $10 per s[h]are consideration and assume that net cash per share roughly matched this figure."[128]

---

[124] Compl. ¶¶ 14, 57.

[125] Pl.'s Opp'n 41–42.

[126] *Offringa v. DMY Sponsor II, LLC*, C.A. No. 2023-0929-LWW, at 21:6–8 (TRANSCRIPT) ("To be clear, . . . there's no *per se* requirement that a net cash per share figure be disclosed outright. I don't view this as a strict liability claim."); *Newman v. Sports Acq. Hldgs. LLC*, C.A. No. 2023-0538-LWW*,* at 19:12–17 (TRANSCRIPT) (Del. Ch. May 28, 2024) (noting that "there's no per se requirement that a net cash per share figure be disclosed outright" but rather, the omission is examined "in view of the relative amount of dilution and dissipation of cash").

[127] *See* Proxy 8, 27, 29, 76, 86, 89.

[128] *XL Fleet*, C.A. No. 2021-0808-KSJM, at 33:1–5.

Defendants also dispute that the omission of net cash per share was material. I note that "[w]hether a SPAC has disclosed all material information regarding the cash per share it would invest in the combined company is a fact dependent analysis"[129] not readily subject to dismissal. I find that, on the facts alleged at this pleading stage, it is reasonably conceivable that a delta of 25% between implied value and cash per share is material. Further, while Defendants argue that stockholders *could* have calculated net cash per share based on information embedded in the proxy, at this pleading stage I find that an actionable misstatement in the Proxy is not adequately rebutted by more cryptic proxy material to the contrary.[130]

Defendants also argue that "the number of stockholders who elected to redeem their shares *strongly* suggests that the Proxy was not misleading or contained omissions."[131] Here, approximately 84% of eligible shares were redeemed, representing a higher redemption rate than in prior cases.[132] This, I concede, suggests a lack of a material omission, but at this pleading stage, Plaintiff's allegations make it reasonably conceivable that there has been a breach of fiduciary duty in regard to the Proxy. I cannot draw the defendant-friendly inference that

---

[129] *Delman*, 288 A.3d at 725 n.234.
[130] *See Salladay v. Lev*, 2020 WL 954032, at *13–16 (Del. Ch. Feb. 27, 2020) ("[P]roxies should be lucid, and not a game of Clue.").
[131] Defs.' RB 10 (emphasis in original); Defs.' OB 33–34.
[132] Defs.' OB 33; *see, e.g.*, *Multiplan*, 268 A.3d at 798 ("Fewer than 10% of [the SPAC's] public investors opted to exercise their redemption rights."); *Delman*, 288 A.3d at 706 ("Approximately 29% of the public stockholder elected to redeem [their] shares.").

MCAD's 84% redemption rate demonstrates adequate Proxy disclosures as a matter of law.

This case, I note, appears to be the first to deny a motion to dismiss *solely* on an affirmative statement of investment value in conflict with a failure to also disclose net cash.[133] But as Defendants conceded at oral argument,[134] nothing in the case law suggests that such a claim, adequately pled and considered alone, could not survive a motion to dismiss.[135] Again, the allegations here may ultimately not support a finding of unfairness, but Plaintiff has met his pleading burden to survive a motion to dismiss.

### 3. Exculpation

I have already found that the Director Defendants were not independent and disinterested here. MCAD's charter contains an exculpatory provision eliminating director liability for breaches of the duty of care.[136] The Director Defendants argue that the Complaint has failed to state a non-exculpated loyalty claim against each of them.

---

[133] Defs.' OB 34; Defs.' RB 10.

[134] Tr. 6:23–7:13.

[135] *See, e.g.*, *XL Fleet*, C.A. No. 2021-0808-KSJM, 33:7–10 ("It's reasonably conceivable that the failure to disclose the net cash per share figure outright constituted a breach under the precedent of *[Laidlaw]*"); *Laidlaw*, 2023 WL 2292488, at *1 (determining that net cash per share "would have been material to public stockholders choosing between investing and redeeming").

[136] Exs. 2-13 to Transmittal Aff. of Andrew H. Sauder In Supp. Of Defs.' Opening Br. Supp. Their Mot. To Dismiss Verified Class Action Compl., Ex. 10 at Art. VIII, Dkt. 30.

Where such an exculpatory charter provision exists, "[a] plaintiff seeking monetary damages from a director must state a claim for the breach of the duty of loyalty."[137] A plaintiff must plead "facts supporting a rational inference that the director harbored self-interest adverse to the stockholders' interests, acted to advance the self-interest of an interested party from whom they could not be presumed to act independently, or acted in bad faith."[138] Although Defendants assert that Haight, Milbourn, and Zhang should be dismissed under *Cornerstone*,[139] as detailed above, Plaintiff sufficiently alleges that Haight, Milbourn, and Zhang engaged in a conflicted self-interested transaction. Likewise, "[P]laintiff's claims against the Board are 'inextricably intertwined with issues of loyalty.'"[140] As such, Plaintiff's claims are not exculpated.

It is true that these Defendants had only a small—$20,000—interest in this transaction, and that Plaintiff has failed to plead facts from which I may infer that such a sum was material to any of them. Plaintiff points out that the Director Defendants had received several other SPAC board appointments from the Founder,[141] presumably multiplying their conflicted interests, and it is a reasonable

---

[137] *Delman*, 288 A.3d at 728 (citing *In re Cornerstone Therapeutics Inc., S'holder Litig.*, 115 A.3d 1173, 1175–76 (Del. 2015)).
[138] *Cornerstone*, 115 A.3d at 1179–80.
[139] *See id.* at 1179 ("[P]laintiffs must plead a non-exculpated claim for breach of fiduciary duty against an independent director protected by an exculpatory charter provision, or that director will be entitled to be dismissed from the suit.").
[140] *Delman*, 288 A.3d at 728 (quoting *Emerald P'rs*, 787 A.2d at 93).
[141] Compl. ¶ 44; Pl.'s Opp'n 13.

assumption that each had an expectation of being so employed in future SPAC ventures. As pointed out above, the shares held by the Director Defendants are *founder* shares, which creates an interest divergent from that of public stockholders. I find that Plaintiff has (barely) asserted facts sufficient, at the pleading stage, to state a non-exculpated claim against these Defendants.

### C. The Unjust Enrichment Claim

Plaintiff also brings an unjust enrichment claim against Sponsor and Director Defendants.[142] The elements of unjust enrichment are "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification and (5) the absence of a remedy provided by law."[143] "If the plaintiff prevails on his fiduciary duty claims, he will similarly succeed in proving unjust enrichment."[144]

Plaintiff alleges that Defendants were "unjustly enriched" by the directors' disloyal conduct, as described in Plaintiff's breach of fiduciary duty claims.[145] Specifically, Plaintiff argues that "Defendants were motivated to issue deficient disclosures to minimize redemptions."[146] Plaintiff pleads adequate facts to satisfy an unjust enrichment claim. While Plaintiff cannot obtain a double recovery, "'[o]ne

---

[142] Compl. ¶ 108–11.
[143] *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 585 (Del. Ch. 1998).
[144] *Delman*, 288 A.3d at 729.
[145] Compl. ¶¶ 108–11.
[146] Pl.'s Opp'n 55.

28

can imagine . . . factual circumstances in which the proofs for a breach of fiduciary duty claim and an unjust enrichment claim are not identical, so there is no bar to bringing both claims' against the same defendants."[147]

### III. CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is denied. The parties should submit a form of order consistent with this Memorandum Opinion.

---

[147] *Delman*, 288 A.3d at 729 (quoting *MCG Cap. Corp. v. Maginn*, 2010 WL 1782271, at *25 n.147 (Del. Ch. May 5, 2010)).